**E-FILED**
Monday, 27 March, 2006  11:56:04 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| TODD C. BRINKLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1073 |
| | ) | |
| JO ANNE B. BARNHART | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm. For the reasons set forth below, Plaintiff's Motion for Summary Reversal [#16] is DENIED and the Commissioner's Motion to Affirm [#21] is GRANTED.

## BACKGROUND

### A.    Procedural History

Plaintiff Todd C. Brinkley ("Brinkley") previously applied for and received Supplementary Security Income ("SSI") benefits from August 30, 1996 through May 30, 2002. (R. at 13.) These benefits were suspended and then terminated because Brinkley was incarcerated. (Id.)

Brinkley filed another application for SSI payments on June 25, 2002, with a protective filing date of May 31, 2002, alleging an inability to work beginning June 15, 1994, due to muscular joint discomfort, and speech defect. (Id.) Brinkley's claim was denied and his request for reconsideration was also denied. (Id.) Brinkley then filed a request for a hearing before an

Administrative Law Judge ("ALJ"). (R. at 35.) On March 18, 2004, Brinkley appeared, with counsel, at a hearing before ALJ Michael J. Bernstein. (R. at 13, 20). Dr. James E. Lanier, Ph.D. testified at the hearing as a Vocational Expert. (Id.) ALJ Bernstein found that Brinkley was not disabled within the meaning of the Social Security Act (the "Act") and denied Brinkley's request for benefits on September 14, 2004 (R. at 20). The Appeals Council affirmed the ALJ's decision on January 21, 2005, making the ALJ's decision the final administrative decision of the Commissioner. (R. at 5.) Brinkley then filed a Complaint in this Court seeking a review of the final administrative decision of the Commissioner pursuant to 42 U.S.C. §405(g).

**B.     Facts**

At the time of his hearing before the ALJ, Brinkley was 38 years old, had an eleventh grade education, and no relevant work experience. (R. at 18.) Brinkley lived with his wife and was attending school with the hopes of obtaining his general equivalency diploma. (R. at 14.) At the hearing before the ALJ, Brinkley testified that he understands basic math and he reads, although he does both of these things at a slow pace. (R. at 14.) Brinkley also testified that he does no housework and avoids all aggressive tasks. (R. at 16.) He does not drive because sitting for long periods causes him to have stiffness in his joints. (Id.) Brinkley is able to care for his personal needs and bath and dress himself. (Id.) He is able to walk without assistance. (Id.) Brinkley smokes approximately half a packet of cigarettes per day. (Id.) He wakes up each morning around 7:00 a.m., goes to school two to three days per week, and returns home around noon where he watches soap operas or movies until late in the evening. (Id.) Brinkley is able to find his way to his classes on his own and does not have any difficulty interacting with other students or school administrators. (Id.) Brinkley has not consumed alcohol or drugs in the past five years. (Id.)

1.       **Medical Evidence**

At the hearing, the ALJ noted that the evidence established that Brinkley suffered from a myocardial infarction in 1997 and has evidence of mild degenerative joint disease with L1, S5 compromise that this could limit his ability to work.  (R. at 15.)  Brinkley has been treated for irregular heart beats.  (R. at 16.)  A review of chest x-rays taken in 1970 showed that the aorta and heart were normal.  (Id.)  Brinkley's periodic visits to a medical clinic revealed questionable prolapse and hyper lipidema and that he has a history of hypertension for which he takes medication.  (Id.)  An EKG from 1996 did not show any signs of abnormalities and his CBC was normal.  (Id.)

Dr. Richard Flores evaluated Brinkley in August, 2002.  (R. at 17).  The doctor noted that Brinkley did not exhibit any visual or hearing deficits and that his speech was normal and understandable.  (Id.)  His heart sounds and rhythm rate were regular and there was no jugular vein distention or pedal edema.  (Id.)  The thoracic spine was not deformed and his range of motion in all extremities appeared normal and all joints were flexible.  (Id.)  There was some decreased range of motion noted, secondary to joint stiffness and his obesity was noted.  (Id.)  Brinkley was 230 pounds at the time and stands approximately 5'10" tall.  (Id.)  Otherwise, the doctor noted that the spine did not show any anatomic deformity along cervical, thoracic, or lumbar regions, except where there was some tenderness along the L1-S5 region.   (Id.)  Brinkley's gait appeared normal with normal weight bearing on the joints, spine, pelvis, and lower extremities.  (Id.)  Brinkley did not show signs of atrophy and had the motor strength to pick up coins, button items, and hold utensils.  (Id.)

Additionally, the state agency physicians who reviewed the record noted that based on the evidence, Brinkley's complaint associated with mitral valve prolapse and complaints of

myotonia[1] were negative, as the examinations were all negative.  (Id.)  Chest X-rays and lungs and range of motion were negative, and there was no significant swelling and stiffness of joints and shortness of breath on exertion.  (Id.)  These physicians concluded that Brinkley was capable of medium level exertion with no other limitations except limited climbing of ladders, ropes, and scaffolds.  (R. at 18.)

## 2.    Brinkley's Testimony

Brinkley alleges an inability to work, beginning June 15, 1994, due to muscular joint discomfort and speech defect.  (R. at 13.)  He contends that he has joint stiffness and fatigue, as well as vision deficit related to a family history of myotonia, although he admits that he has never been diagnosed with that condition.   Brinkley relies on an inhaler and non-prescription medications for asthma.  (Id.)  The ALJ summarized Brinkley's testimony as follows:

> According to claimant's testimony, he experiences daily back pain, which appears to radiate down his leg.  He stated that his pain level usually stays around 8 (on a scale of 1 to 10 with 10 being the highest).  He reported that cold weather causes intense discomfort, and any aggressive action or movement triggers intensified discomfort.  He mentioned that Ibuprofen is taken for pain relief, and he uses ice packs or Ben Gay ointment to rub his joints.  These modalities provide some relief, but do not eliminate his pain.  In addition to the musculoskeletal stress from his back, the claimant reported that he has hand/digit pain when he attempts to coordinate or hold objects of any significant weight.  He said that he must hold items close to his upper body; otherwise, he drops things because of the pressure he feels along his arm and wrist.

> The claimant stated that he was informed that he has myotonia myopathies, and that he has inherited family traits for the disorder.  He associated muscular problems that cause his muscles to constrict and not relax, his joints become stiff, and he mentioned that as a result of the condition, temperature variance affect his joints and they become spastic.  He reported at times, he has sensations that move along his upper body and sometimes down to his feet.  Because of diminished upper body strength, the claimant contends that at times it is difficult to maintain

---

[1]   According to the Muscular Dystrophy Association's website, myotonia is a common name for two forms of myotonia congenita.  Although Brinkley does not indicate which form of the disease he allegedly suffers from, both types appear to be from a group of diseases that cause problems with the tone and condition of skeletal muscles characterized by symptoms of delayed muscle relaxation and muscle stiffness, typically provoked by sudden movements.  *See* Muscular Dystrophy Association: Diseases – Myotonia Conegnita, http://www.mdausa.org/disease/mc.cfm#special (last visited Mar. 22, 2006).

a firm grip using his left hand, and so he sometimes must rely on his right dominant hand to coordinate items, or he uses his forearm to balance or support objects in his hands. Nevertheless, when asked about weights that he could possibly handle, the claimant stated that he could lift objects weighing between 35 to 100 pounds if they are held close to his body. He stated these objects would cause pressure on his back, but he could carry/lift at this level. When questioned about the ability to stand and walk, the claimant responded that he could stand a half-hour, walk about two blocks, and he could sit an hour before making a postural change.

The claimant stated that muscle weakness, and pressure on his arms and along his back, makes it stressful to stand for long periods.

(R. at 15–16.) At the time that he was examined by Dr. Flores, Brinkley's chief complaints concerned mitral valve and myotonia and he contended that he suffered from fatigue and joint stiffness daily, especially in the knees and ankles. (R at 17.) Brinkley reported that his ability to withstand extensive standing and walking was compromised and he had difficulty because of bilateral sciatica that moved along his lower extremities. (Id.) He also reported that his 1997 myocardial infarction caused continual fatigue and exertional dyspnea. (Id.) Brinkley also mentioned having chest pain, left side neck pain, and left upper body pain that was relieved with rest. (Id.) Brinkley told the doctor that he did not take medications for chest pain nor was he on any prescribed medications or strong steroidial agents. (Id.)

### 3.    Testimony of the Vocational Expert

The ALJ found that the objective medical evidence and Brinkley's lifestyle suggest that Brinkley retains the capacity for light work with some reduction of the left upper extremity along with limitations associated to avoiding dust, fumes, and gas. (R. at 19.) The ALJ noted that if he were capable of performing a full range of light work, the Medical-Vocational Guidelines would find him not-disabled. (Id.) However, the ALJ noted that strict application of this rule was not possible because Brinkley has non-exertional limitations which narrow the range of work that he is capable of performing. (Id.) The ALJ hypothetically asked the VE whether there were

occupations that a person of Brinkley's age, education, work experience could perform were such person to have Brinkley's residual functioning capacity.  (Id.)

The VE testified that Brinkley's residual functioning capacity allowed for employment opportunities identified as "sorter (1991 local region), reduced by 50% for left hand problems; parking lot attendant (1954 local region), reduced by 30% void of a driving license."  (Id.)  The VE concluded that there are jobs, existing in significant numbers in the national economy that Brinkley is capable of performing.  (Id.)

## DISCUSSION

To be entitled to disability benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled.  Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits.  *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process.  First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980).  That factual determination is made by using a five-step test.  *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows:  (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20

C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled.  A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled.  *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, at step five, the burden shifts to the Commissioner to show that the plaintiff has the ability to engage in some other type of substantial gainful employment.  *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence.  *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989).  The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986).  In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971).  Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous.  *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); *Imani v. Heckler*, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In his appeal, Brinkley raises two arguments: (1) the ALJ erred by failing to fully and fairly develop the record because the ALJ did not obtain Brinkley's prior file which found him disabled prior to his incarceration, and (2) the ALJ erred by failing to include all of Brinkley's impairments (both severe and non-severe) in the hypothetical presented to the vocational expert ("VE").  Brinkley asks this Court to reverse the Commissioner's denial of benefits and remand his case to the ALJ for further proceedings.

**A.     The ALJ's Failure to Consider Brinkley's Prior Records**

Brinkley argues that the ALJ erred because he did not fully and fairly develop the record when he did not obtain Brinkley's prior social security file, which included evidence and records which were used to find him disabled on his prior application.  Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record. *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000).  Failure to fulfill this obligation is "good cause" to remand for gathering of additional evidence.  *Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir.1991).  Brinkley's argument centers around his belief that if he was disabled prior to entering prison and there is no evidence in the record to suggest that his medical condition has improved, that the ALJ should find him disabled.  In support of his argument, Brinkley points out that the Social Security Administration ("SSA") only stopped giving him benefits because the regulations required that they be terminated and not because the SSA found that his medical condition had improved.  Brinkley argues that the ALJ should have consulted his previous Social Security file prior to making a finding of "not-disabled", or, in the alternative, the ALJ should have sent Brinkley to be tested for myotonia.

In response, the Commissioner argues that the agency did not have an obligation to find that Brinkley's condition improved prior to terminating his benefits because his benefits were

terminated because of his incarceration and not because of his medical status. The Commissioner contends that the only way for Brinkley to become eligible for benefits again was to file a new application and establish that he was disabled as of the date of his application. Accordingly, the Commissioner argues that Brinkley's prior file is not relevant to a decision on whether Brinkley now suffers from a disability. Moreover, the Commissioner notes that Brinkley has not identified what evidence would have been included in his previous file that the ALJ did not consider in his evaluation of Brinkley's current application. Finally, the Commissioner argues that Brinkley's contention that the ALJ erred because he did not send him to be tested for myotonia is without merit because Brinkley did not set forth any medically determinable evidence to establish that he has myotonia.

Brinkley seems to base much of his argument on his belief that he should be considered disabled now because he was found to be disabled prior to his incarceration and his medical condition has not improved. An individual is not entitled to receive supplemental security income benefits if he is a resident of a "public institution" such as a prison. 20 C.F.R. § 416.1325 (providing for suspension of benefits for a recipient who is a resident of a public institution). Moreover, an individual's benefits will be terminated if the suspension continues for twelve consecutive months. 20 C.F.R. § 416.1335. A party whose benefits have been terminated must file a new application in order to receive benefits again. *See* 20 C.F.R. § 416.305(a). The Seventh Circuit dealt with a similar situation in *Bunch v. Heckler,* 778 F.2d 396 (7th Cir. 1985). In *Bunch*, a claimant received social security benefits prior to being incarcerated. *Id.* at 397. Her benefits were then terminated because she was in prison for more than twelve consecutive months. *Id.* After her release from prison, she reapplied for benefits and was found to be ineligible. *Id.* Upon review of the District Court's decision upholding the

Commissioner's denial, the Seventh Circuit affirmed the Commissioner's denial of benefits on her second application. *Id.* at 402.

The instant case is analogous to *Bunch.* Here, Brinkley's benefits were terminated because he was incarcerated for a period of more than twelve consecutive months. Accordingly, upon release from prison, Brinkley was required to re-apply for social security benefits and the Commissioner was entitled to review his claim as it would any other. As in *Bunch*, the Commissioner was not required to find that Brinkley was now suffering from a disability because because he had previously been found disabled.

Brinkley argues, however, that the Commissioner erred because the ALJ did not fully and fairly develop the record. As evidence of this, Brinkley argues that his attorney submitted a letter to the ALJ three months before the hearing asking the ALJ to subpoena his previous social security file which found him disabled prior to his incarceration, (*see* R. at 133), and the attorney also asked the ALJ to find and consider the prior file at the hearing. As it appears from the ALJ's decision that he never located the old file, Brinkley argues that this case should be remanded and the prior file should be considered as part of the record.

Although the ALJ has the responsibility of fully and fairly developing the record, Brinkley has the responsibility of proving that he was disabled as of May 2002, when he applied for benefits after his incarceration. Accordingly, it is hard to see how the prior file could have assisted the ALJ. Moreover, the letter that Brinkley's attorney sent to the ALJ requesting the ALJ to subpoena the file does not comply with the requirements of 20 C.F.R. 416.1450(d)(2) which states:

> Parties to a hearing who wish to subpoena documents or witnesses must file a written request for the issuance of a subpoena with the administrative law judge or at one of our offices at least 5 days before the hearing date. The written request must give the names of the witnesses or documents to be produced; describe the

address or location of the witnesses or documents with sufficient detail to find
them; state the important facts that the witness or document is expected to prove;
and indicate why these facts could not be proven without issuing a subpoena.

20 C.F.R. 416.1450(d)(2) (2006).  In the instant case, Brinkley's attorney filed the request in a

timely manner; however, the letter did not include sufficient information.   The letter merely

states:

> Request for Prior File
>
> Todd was born January 25, 1966, and was granted disability in 1986.  Todd was
> terminated in October 1987 because he was in nonpayment for a year.  This was
> because he was in prison.
>
> Because his disability relates to his condition in 1986, we are dealing with the
> question of medical improvement.  <u>I request that the SSA provide us with his
> prior file as it relates to the question of his medical improvement</u> and the issues
> you will be deciding on this application.

(R. at 133 (emphasis in original).)   Although this letter describes the document as Brinkley's

prior social security file, the letter does not state the important facts that the prior file would

prove or explain why these facts couldn't be proven without a subpoena.  Moreover, even if the

letter had been sufficient, it is not clear how the prior file would assist Brinkley in his new claim

for benefits because Brinkley's new claim was based on an onset date of May 31, 2002 and his

old file did not pertain that that time period.

Moreover, a review of the administrative record indicates that the ALJ considered an

abundance of evidence dating back to the 1970's and that the ALJ found that the medical

evidence, combined with Brinkley's testimony, did not support a finding that he was disabled as

of May 31, 2002.  Furthermore, Brinkley's assertion that the ALJ should have retrieved the prior

file because he suspected that he had myotonia is unpersuasive.  Brinkley admitted that he had

never been diagnosed with myotonia and therefore presumably the prior file would not have

assisted the ALJ in his determination.

Brinkley also argues that the ALJ should have ordered that Brinkley undergo a test for myotonia to determine if he actually suffers from myotonia and if this condition would qualify as a severe impairment that would prevent him from working.  However, requiring the ALJ to request such a test based on testimony from Brinkley and his mother that they suspect that he suffers from myotonia would result in the burden of proof being shifted from Brinkley to the Commissioner.  It is Brinkley's responsibility to prove that he has a medically severe impairment or combination of impairments and that the impairments prevent him from working.  *Bowen v. Yuckert,* 482 U.S. 137, 146, n. 5.  The Social Security guidelines state:

> **What is needed to show an impairment.**  If you are not doing substantial gainful activity, we always look first at your physical or mental impairment(s) to determine whether you are disabled or blind. Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques (see § 416.927). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms. (See § 416.928 for further information about what we mean by symptoms, signs, and laboratory findings.)

20 C.F.R. 416.908.  The ALJ did not err when he refused to send Brinkley to be tested for myotonia.  It was Brinkley's responsibility to set forth "medical evidence consisting of signs, symptoms, and laboratory findings" to show that he has myotonia.  Brinkley failed to do so. Brinkley did testify that he suffers from symptoms that could be characteristic of myotonia such as difficulty grasping things in his left hand and a worsening of this condition in cold weather; however, he admitted that he had never been diagnosed with the disease.  His mother contends that he was diagnosed with "the disease" when he was ten but she never states that "the disease" was myotonia or provide any information from a physician to verify this claim.  Finally, Brinkley did not submit any medical evidence or laboratory results to indicate that he actually has myotonia and the physicians who reviewed his medical evidence stated "chief complaint is mitral valve prolapse and myotonia but exam is negative."  (R. at 324.)  Moreover, Brinkley

admitted that he had never been diagnosed with myotonia and the evidence indicates that he merely believes that he has myotonia because other members of his family suffer from this condition.  It was Brinkley's responsibility to set forth medical evidence of his condition and not the ALJ's responsibility to send him to be tested based solely upon Brinkley's personal suspicions.  Accordingly, the Court finds that the ALJ did not err when he failed to retrieve Brinkley's previous social security file or send him to be tested for myotonia.

**B.     The ALJ's Failure to Include all of Brinkley's Impairments in the Hypothetical Presented to the Vocational Expert.**

Brinkley's next argument is that the ALJ erred when he failed to include all of Brinkley's impairments (both severe and non-severe) in the hypothetical that was presented to the vocational expert ("VE").  Brinkley argues that the hypothetical was legally insufficient because the ALJ did not include Brinkley's limitations based on his asthma, myotonia, or untreated mental illness.  The ALJ presented the VE with a hypothetical that involved a "38 year old individual, with 11 years of formal education, no past relevant work, and limited exertionally to light work without exposure to excessive dust, fumes, or gases, and using the left upper extremity primarily to assist the dominant right upper extremity."  The VE testified that there are sufficient jobs in the regional economy that Brinkley could perform.  The ALJ then modified the hypothetical and added that the hypothetical individual also suffered from a speech impediment and did not have a driver's license.  The VE testified that these characteristics would further limit the types of occupations available but that sufficient occupations would still be available in the regional economy.  From this, the ALJ concluded that Brinkley was not disabled.

Brinkley argues that the ALJ erred in creating the hypothetical because he did not indicate that the individual in the hypothetical had asthma, suffers from myotonia, and mental illness.  However, a review of the hypothetical indicates that the ALJ did take into account

Brinkley's asthma because he characterized the hypothetical individual as being a person who was limited to light work without exposure to excessive dust, fumes, or gases.  Additionally, the ALJ noted that Brinkley uses an inhaler "for intermittent breathing unrest, but otherwise he took non-prescription medication . . . The claimant has complained of periodic breathing distress but continues to smoke."  Accordingly, the Court finds that the ALJ took Brinkley's asthma into consideration when he determined that Brinkley was only capable of performing light work and properly crafted the hypothetical to be based on a person with similar capabilities.

Secondly, Brinkley's claim that the ALJ should have included the fact that he suffers from myotonia in the hypothetical does not compel this Court to issue a remand.  The ALJ credited the DDS physicians' findings that Brinkley's "complaints of myotonia were negative, as the examinations were all negative."  If Brinkley had set forth sufficient medical evidence to demonstrate that he suffers from myotonia, which this Court has found he did not, then the ALJ would have been required to include this in his determination of Brinkley's residual functioning capacity.  Here, the ALJ found that Brinkley did not meet his burden of establishing that he suffers from myotonia and therefore the ALJ's decision not to include this in his hypothetical is supported by substantial evidence.  It should be noted, however, that even though the ALJ did not state that the hypothetical person has myotonia, the ALJ did acknowledge certain limitations which Brinkley believes result from myotonia.  For example, in defining the hypothetical person, the ALJ indicated that the hypothetical individual could only use his left upper extremity primarily to assist the dominant right upper extremity.  Accordingly, even though Brinkley failed to establish that he has myotonia, the ALJ did credit his limited use of his left arm and therefore the Court finds that the hypothetical was based on substantial evidence.

Finally, Brinkley argues that the ALJ should have included his mental impairment in the hypothetical that was presented to the VE.  However, in the hearing before the ALJ, Brinkley stated that he had completed an eleventh grade education, he was currently attending classes to obtain his GED, he could read newspapers and books, albeit at a slow pace, and he was somewhat able to make change when handling money.  Although Brinkley informed the ALJ that he was originally granted disability benefits, prior to his incarceration, because he was learning disabled, neither Brinkley nor his counsel introduced any evidence to indicate that Brinkley suffered from a mental disability as of May 2002.  Accordingly, the ALJ was not under any obligation to include mental impairment as a characteristic of the hypothetical person that was presented to the VE.  If Brinkley and his attorney believed that Brinkley suffered from a mental impairment, it was their responsibility to include evidence of this in the record.  Their failure to do so does not mean that the ALJ's hypothetical was not supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Reversal [#16] is DENIED and the Commissioner's Motion to Affirm [#21] is GRANTED.

Entered this 24th day of March, 2006.


                                                    s/Michael M. Mihm
                                            _____
                                            Michael M. Mihm
                                            United States District Judge